IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. HARRIS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

RYLEE HARRIS, APPELLANT.

Filed May 21, 2024.    No. A-23-747.

Appeal from the District Court for Scotts Bluff County: LEO P. DOBROVOLNY, Judge, on appeal thereto from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

Stacy C. Bach, of Nossaman Petitt Law Firm, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Teryn Blessin for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

When Rylee Harris was a senior in high school, two female students alleged he inappropriately touched them during evening rehearsals for the school's musical. Following a bench trial in the county court for Scotts Bluff County, Harris was convicted of two counts of third degree sexual assault. He was sentenced to 12 months' probation for each count, to be served concurrently, and was required to register under the Sex Offender Registration Act for 15 years. Harris appealed his conviction to the Scotts Bluff County District Court, claiming the evidence was insufficient to support a finding of guilt on either count. The district court affirmed his convictions, as does this court.

- 1 -

## II. BACKGROUND

### 1. CHARGES

On April 15, 2022, the State filed a complaint in the county court charging Harris with one count of third degree sexual assault, non-injury, a class I misdemeanor, pursuant to Neb. Rev. Stat. § 28-320(1)(a) and (3) (Reissue 2016). The State amended the complaint twice, each time adding an additional charge of third degree sexual assault against Harris. On the State's motion, the court dismissed the second count at trial. The remaining charges included count I of the complaint, which alleged that on April 5, Harris unlawfully subjected E.F. to sexual contact without her consent, and count III of the complaint, which alleged that on March 17, Harris unlawfully subjected S.N. to sexual contact without her consent.

### 2. TRIAL

A bench trial was held on January 23 and 24, 2023. We set forth only the evidence necessary to address the error assigned on appeal.

### (a) March 17, 2022, Incident

S.N. testified that she was 17 years old at the time of trial and that Harris attended her high school in the year prior. During the spring of 2022, they both participated in "Acappella" and the school musical. During the evening of March 17, S.N. and Harris were attending musical practice in the high school auditorium. When they were about to begin a dance for a particular scene, she "felt hands touch [her] butt." When S.N. turned around to see who had touched her, she saw Harris standing directly behind her and smiling at her in a "creepy" manner, "like he was proud of himself kind of smile." This made S.N. feel very uncomfortable. She testified that "[t]he scene had just started, so [she] continued dancing" and "acted like it didn't happen." Harris admitted at trial that his hand came into contact with S.N.'s buttocks but that he accidentally bumped into S.N. when he lost his balance and his hand slipped. According to Harris, he sometimes loses his balance as a result of his cerebral palsy.

S.N. informed her parents of the incident, as well as her choir teacher and an assistant principal. When she informed the choir teacher, he asked S.N. if she was "sure [Harris] didn't just fall down" and S.N. assured him that she was "absolutely positive [Harris] did not just fall down." S.N. initially declined to press charges against Harris and allowed the school administration to handle the matter. Upon completing its investigation, the school administration determined that the incident was an accident. S.N. felt that "the school didn't handle it . . . appropriately" and decided to seek the assistance of law enforcement. Harris testified that he tried to quit the musical after this incident took place because he did not want to "make anybody else mad with [his] presence." However, the director and his father convinced him to stay in the play since he had worked hard to be in it.

According to S.N., a couple days prior to the March 17, 2022, incident, Harris "had given [her] a look one night in practice. He looked [her] up and down and licked his lips and . . . bit his lip at [her] . . . while [they] were backstage." This made her feel "[v]ery uncomfortable." She further stated that after the incident, she overheard Harris during choir class say that "some women are just asking for it." Harris testified that he "never made that statement." When asked on

cross-examination if she "didn't want [Harris to be] part of the musical," S.N. responded that she "didn't really care."

(b) Incident on April 5, 2022

According to Harris, cast members were becoming irritated with him because he kept sitting down during rehearsals when he would become fatigued. He stated that, on April 5, 2022, at the beginning of musical rehearsal, he "muttered to [him]self . . . God, I hate this cast." E.F., a fellow student in the musical, then responded, "Don't worry, [Harris], we hate you too." At trial, E.F. denied making this comment.

E.F. testified that on April 5, 2022, "Harris passed [her] and grabbed . . . [her] butt" during rehearsal. When asked if she initially knew "what exactly had transpired," she responded, "Yes," but that she "didn't want to believe it." She explained that she wanted to believe Harris had touched her with his hat, but she realized that he had to have touched her with his right hand because he was on her left side, and his hat was in his left hand. E.F. further stated that Harris "squeezed his hand twice."

C.M., a fellow student at the high school, and a "good friend[]" of E.F.'s, testified that he was also in the school musical and observed the April 5, 2022, incident take place. C.M. stated that he was standing "farther behind" E.F. as she was preparing to go on stage, when he observed Harris "put[] his hand out and touch[] . . . [E.F.] on the butt." C.M. stated that Harris used his right hand to touch the left side of E.F.'s buttocks. C.M. testified that Harris continued walking after it happened and E.F. turned around and asked him whether she was touched by "a hat or [Harris'] hand." C.M. told E.F. that Harris had touched her with his hand, and she began "tearing up." E.F. then informed a teacher of the incident, who took her to the hallway to calm her down.

Harris testified that a student suddenly approached him during rehearsal and told him that if he "ever touch[ed] anybody again, [she would] put [him] in [his] place." He claimed he did not know what the student was talking about; he became upset and went to a trusted adult in the auditorium. Harris then went to turn in his microphone. E.F. confronted him, knocking him to the ground with a punch to his face. E.F. told Harris not to "touch [her] or anyone else ever again." Harris responded, "I am sorry . . . it won't happen again. I didn't do anything." Harris acknowledged that he stated, "it won't happen again," but he did not have "any idea" why E.F. was hitting him. Harris further testified that he did not recall being anywhere near E.F. during the rehearsal. However, he agreed it was possible he bumped into E.F. without noticing. According to C.M., when Harris touched E.F. on April 5, Harris did not appear to be having any problems with his balance.

E.F. stated that in the spring of 2022, prior to the April 5, 2022, incident, she had an uncomfortable interaction with Harris. He asked her how she was doing, and E.F. responded that she was "good" and asked how he was doing. In response, he said "I am just fine now that I see you."

(c) Inappropriate Comments

C.M. had known Harris since his freshman year of high school and heard Harris make numerous comments regarding female classmates. C.M. stated that "out of the blue," Harris would "degrade women and not really speak very highly of them." He said that Harris spoke about women

in a sexual manner "about every other interaction [he] . . . had with him." Another student testified that Harris often made "off-putting" comments of a sexual nature. But he acknowledged that some of the other boys in the choir would also use "vulgar language" and make sexual comments. Harris admitted to making certain sexual comments, but stated that he was simply attempting to "fit in."

Catherine Jones-Hazledine, a clinical psychologist, testified that she had been treating Harris for over 10 years. She explained that because of Harris' cerebral palsy, he was "socially and emotionally delayed." She stated that although Harris "intellectually and cognitively . . . functions at a normal level," he "has difficulty with social skills and social appropriateness." She stated that "cerebral palsy can lead to . . . difficulty regulating . . . emotion" and can impair impulse control. This can cause an individual "to just blurt something out without thinking about how it might be received." Dr. Jones-Hazledine stated that Harris would sometimes join a conversation where other participants would be "joking about a certain topic." In an attempt to "go with the social flow," he would chime in with his own comments, only to find he may have "crossed a line" based on the other participants' reactions.

### (d) Harris' Physical Disabilities

According to Dr. Jones-Hazledine, Harris has difficulty walking and has used augmentative devices to aid him in walking. While he can walk without such devices, he has difficulty maintaining his balance and it "takes a toll" on him. She stated that Harris often bumps into things as he is moving about, so apologizing for bumping into a person might "not necessarily [be] on his radar . . . because it is such a common part of his day." A licensed physical therapist treating Harris also testified that Harris' "balance is challenged when he's walking" and that he "takes steps or grabs places" to regain his balance and prevent himself from falling. Another physical therapist who had worked with Harris stated that Harris is unbalanced and "has a higher than typical incidence of falling."

Harris explained that even though his medical professionals recommended that he continue using his "sticks" to support him as he walked, he gradually stopped using them because his goal for his senior year of high school was to walk without them. He stated that he would become unbalanced after walking "for long periods of time" and begin to sway. He would bump into things and reach out to stop himself from falling. Harris was not using his crutches on the days of either incident. C.M. testified that when Harris first began walking without crutches in the year prior to the spring 2022 incidents, he would lose his balance and hold on to one of the "guys" by their arms or shoulders. However, C.M. stated that Harris "was walking normally just fine" in the months leading up to the incidents. He further stated that he had never seen Harris touch someone below the waist when having problems with his balance. S.N. also testified about Harris not using crutches or any other device to walk for the entire spring semester in 2022, but that he started using his crutches when he came back to school a couple days after the incident with E.F.

### (e) Verdict and Sentencing

At the close of evidence, the county court dismissed count II of the second amended complaint with prejudice and took a recess. Upon its return, the court rendered a verdict of guilty on both remaining counts of the second amended complaint. The court commented that "[o]ne of the pillars of the defense['s] case . . . [wa]s that [a] group of students did not like . . . Harris and

that they wanted him out" of the musical and "their Acappella group." However, what "resonated with the court [wa]s that [S.N.] did not want to pursue criminal charges. She wanted to kind of just let this disappear as long as the school took steps to make sure that another occurrence didn't happen." However, when a second occurrence took place, she decided to "pursue her portion of the case." The court concluded that this did "not sound like a vindictive, deceitful teenage girl." As to the April 5, 2022, incident, the court stated that, although E.F. and Harris relayed two completely different versions of the incident, E.F.'s version was corroborated by an independent witness, as well as Harris' "own statements saying it won't happen again."

At a hearing on April 6, 2023, the county court sentenced Harris to 12 months' probation for each count, to run concurrently. The court notified Harris that he would be subject to the Sex Offender Registration Act and would be required to register as a sex offender for 15 years under Neb. Rev. Stat. § 29-4005(1)(b)(i). The court later entered an order consistent with its pronouncement at the sentencing hearing. Harris appealed his convictions to the district court.

In its August 25, 2023, order affirming Harris' convictions, the district court noted that Harris' arguments on appeal were related to "lack of intent" on his part, as well as "credibility of the witnesses." The court reasoned that the evidence did "not support a finding that Harris was falling and reached out to either victim merely to steady himself." It also concluded that the evidence supported "a reasonable finding that the contact was for sexual gratification." It further noted that it was not its role as an appellate court to "pass on the credibility of witnesses."

Harris appeals.

### III. ASSIGNMENT OF ERROR

Harris assigns that the district court erred in finding him guilty on both counts when the evidence at trial was insufficient to sustain convictions for third degree sexual assault.

### IV. STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, and such matters are for the finder of fact. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

### V. ANALYSIS

Harris claims the evidence adduced at trial was insufficient to sustain either of his convictions of third degree sexual assault. Section 28-320(1) provides, in relevant part, that "[a]ny person who subjects another person to sexual contact (a) without consent of the victim . . . is guilty of sexual assault in either the second degree or third degree." If the sexual contact did not cause "serious personal injury to the victim," the "[s]exual assault shall be in the third degree and is a Class I misdemeanor." § 28-320(3). Neb. Rev. Stat. § 28-318(5) (Reissue 2016) defines the term "sexual contact," in relevant part, as:

the intentional touching of the victim's sexual or intimate parts or the intentional touching of the victim's clothing covering the immediate area of the victim's sexual or intimate parts. . . . Sexual contact includes only such conduct which can be reasonably construed as being for the purpose of sexual arousal or gratification of either party.

Intimate parts include the "genital area, groin, inner thighs, buttocks, or breasts[.]" § 28-318(2).

On appeal, "Harris does not dispute that he may have accidentally hit the two girls from behind." Brief for appellant at 8. However, he claims that "it was purely accidental and not intentional." *Id.* We conclude that a rational fact finder could have determined that Harris intentionally touched S.N.'s and E.F.'s sexual or intimate parts and that his conduct could be reasonably construed as being for the purpose of sexual arousal or gratification. As pointed out by the district court in its order affirming Harris' convictions, the State need not prove sexual arousal or gratification, but only circumstances and conduct which could be construed as being for such a purpose. See *State v. Osborn*, 241 Neb. 424, 490 N.W.2d 160 (1992).

### 1. INCIDENT INVOLVING S.N.

S.N. testified that she felt Harris' hands on her buttocks and when she turned around, she saw him smiling at her in a "creepy" manner. She stated that Harris had previously made her uncomfortable on a separate occasion when he "looked [her] up and down and licked his lips and . . . bit his lip at [her]." She further testified that, after the March 17, 2022, incident, she overheard Harris saying that "some women are just asking for it."

On appeal, Harris notes that the school administration determined that the incident was an accident. However, the county court was not bound by any findings made by the school administration. Further, the county court had the ability to consider the subsequent incident on April 5, 2022. Harris further points out that he contested S.N.'s testimony when he testified that he lost his balance and his hand "slipped" when he touched S.N., and that he involuntarily makes faces when he is focused. There was also ample testimony regarding Harris' disability and his difficulty maintaining his balance. While we make note of this evidence, it is not the role of this court to reweigh the evidence or otherwise make determinations regarding witness credibility. See *State v. Figures, supra*. It is the role of the fact finder to make such determinations, and in this case the county court, as fact finder, subscribed to the version of events presented by the State. When viewing the evidence in the light most favorable to the prosecution, the record supports the court's finding that the essential elements of the crime were proven beyond a reasonable doubt as to this count.

### 2. INCIDENT INVOLVING E.F.

E.F. testified that when Harris walked by, she felt him touch her buttocks and "squeeze[] his hand twice." Harris points out that E.F. "was unsure whether it was Harris' hat or hand that touched her." Brief for appellant at 10. C.M. testified that E.F. "asked him if it was Harris' hat or his hand that touched her" and he "agreed that if [E.F.] posed the question to him the way she did, she must not have known if it was in fact his hat or his hand." *Id*. However, whether E.F. questioned what made contact with her buttocks is not relevant to whether Harris intentionally touched E.F.'s buttocks. Further, there was independent witness testimony from C.M. that Harris put "his hand

out and . . . touched [E.F.] on the butt." C.M. further testified that when Harris touched E.F., Harris did not appear to be having any problems with his balance.

E.F. also testified that prior to the April 5, 2022, incident, she had an uncomfortable interaction with Harris. When E.F. asked how Harris was doing, his response was, "I am just fine now that I see you." Also, C.M. stated that Harris spoke about women in a sexual manner "about every other interaction [he] . . . had with him." Another student testified that Harris often made "off-putting" comments of a sexual nature.

A rational fact finder could have relied upon this evidence to determine that Harris intentionally touched E.F. on her buttocks and that his conduct could be reasonably construed as being for the purpose of his own sexual arousal or gratification. Viewing the evidence in the light most favorable to the State, we again find the evidence was such that a rational fact finder could have found the elements of third degree sexual assault beyond a reasonable doubt as to this count.

## VI. CONCLUSION

For the reasons set forth above, we affirm the district court's August 25, 2023, order affirming Harris' convictions.

AFFIRMED.